So, Mr. Berenson, am I pronouncing that right? You got it. You've reserved two minutes for rebuttal, so that gives you eight minutes to start. It's possible I'll pull an audible on that, but that's my current game plan to see how this goes, if that's possible. Well, let's see how it goes. Okay. Good morning. May it please the Court. I'm Stephen Berenson, counsel for Plaintiff Appellant Brian LaBelle. We're here this morning on appeal of the dismissal of Mr. LaBelle's Sarbanes-Oxley whistleblower retaliation claim on summary judgment. There are several whistleblows at issue. The first is his whistleblow concerning mandatory block leave, his claim that he was forced to work during his mandatory block leave and pressure to falsely attest, and the admission of his boss, Mr. Kravitz, that everyone here at Barclays works on their mandatory block leave. Mr. LaBelle testified that based on his experience in training, as well as his conversation with Monica DeMartin, that he believed that he was reporting systemic violations of MBL at Barclays, which he believed, albeit mistakenly, was a violation of an SEC rule or regulation. Our position is, and has been from the very beginning of this case, that Mr. LaBelle did exactly what the plain and unambiguous language of the statute requires, specifically that he reported conduct that he reasonably believed violated a rule or regulation of the SEC. Well, I mean, there needs to be both a subjective and an objective. Correct. Absolutely. And that's the test. And I don't think anyone has debated that Mr. LaBelle subjectively believed he was reporting a rule or regulation of the SEC. Judge Etkins certainly didn't find that. And we believe that this belief was absolutely reasonable for a variety of reasons, one of which MBL is a unique internal control. It is monitored by the SEC. It is, although not required by the SEC, it's based on guidance. It's not required by the SEC. Isn't that sort of, wouldn't that be where you'd stop or start and stop? We don't believe so. It's very different than the case that you cited, I think both parties cited, Catsill or I think, in the case that's on, it's still pending a decision, where there was a situation where that was a company that was basically under an SEC monitor, right? The Catsill case, not one of the ones that I have focused on. I mean, I think the Catsill case, the parties admitted that there was no violation, the plaintiff admitted that there was no violation of an SEC rule or regulation. Right, but I mean, it's a closer call because that was a situation where the company was being, it was under a monitor that was overseen by the SEC. Here we just have a rule that the company came up with that's not required by the SEC, and your view is that it would be objectively reasonable for a person to believe? Absolutely. Failure to comply with that rule is a violation of Sarbanes-Oxley? It's not just a rule the company came up with. It's an important control in the securities industry. Barclays is a broker-dealer subject to securities regulations. It's also a bank. They didn't just come up with this rule. The SEC either requires banks and broker-dealers such as Barclays, particularly broker-dealers, to have an internal set of, a robust internal set of controls. They either must have MBL or they have to have something else that performs the same function  The MBL is monitored by the SEC, meaning that they can ask for information about it. They can ask for information, and they do ask for information about things like attestations. The MBL is so significant that- So are you saying then that if Barclays did not have the MBL, it would not be in compliance because it doesn't have a system, a comparable system? That's correct. The 30B6 witness for Barclays said that she's unaware of any big bank like this that doesn't have this exact particular control in place. And it's so significant that the employees that are- But you acknowledge that there are alternatives. Banks can choose how they want to control for and help minimize the chances of any insider trading or improper behavior, right? The fact that they've chosen maybe consistently to use this technique doesn't mean that they always have to use that technique or as technology changes they couldn't do something else, does it? It's rogue trading, and I think that's kind of a situation like a Bigfoot. I'm sorry, rogue trading. It's rogue trading, and fraud that it's preventing. Yes. And I guess that's a situation to me it's kind of like a Bigfoot. I guess in theory that's possible, but all of the banks have this. And the SEC wants them to have it for good reason. And it's monitored, and you have to file an attestation, and that attestation then goes to- But it's not required. It is- It's not required. It is not- They don't have a robust system. I would argue it's quasi-required. It's not- There is no- We've never contended that there is an SEC regulation which says you have to have MDL. That's not something that we're saying. But getting away from this particular point, even if the MDL is not required by a rule or regulation of the MDL, we have still specifically identified rules that have been violated. The first one with respect to the attestation is the false attestations. To the extent that Mr. LaBelle was pressured to put into a false attestation, and to the extent that Mr. Kravitz admitted that everyone here works on their MDL, that means that they are filling out false attestations- That's a contested fact, isn't it? I mean, he said everyone works on their vacation, and your client says everyone works on their MDL is what he said. Well, it's correct. He's denied that he said that. But in terms of analyzing the reasonableness of a whistleblower, I think it's almost like on a 12B6. You have to assume the accuracy of that allegation. Yeah, yeah. I think the district court did that. Is the way I would put that. I mean, that's not a perfect analogy, but that's the way I would kind of think of it. Where was I? We're talking about the false attestations, which go to the SEC. Providing false information to the SEC is clearly a violation of the rules. This happened in the Earhart case where they gave false information in response to a subpoena. I would also direct the court's attention to the Allen v. Administrative Review Board case from the Fifth Circuit. It's a very interesting case, in my opinion. In that case, the Fifth Circuit found that the SEC's Staff Accounting Bulletin 101 contained only an internal financial statement. It was not protected activity. Despite that the court found the Staff Accounting Bulletin was not a rule or regulation of the SEC, just like NBL here, it nevertheless found that an alleged SAB 101 violation could fall within the fifth enumerated category, which is the category which we claim is at issue here, the rules and regulations, the catch-all rules and regulations of the SEC provision of the Sarbanes-Oxley Act. If, for example, the SAB 101 violations had occurred in financial statements submitted to the SEC, the differentiating factor in a lot of these cases, talking about internal policies, is whether or not it's just a violation of an internal policy, or whether or not the violation of the internal policy information is then submitted to a third party, such as the SEC and to investors. And in terms of just cases where internal controls that were not required by the SEC were still found to be protected activity, there's three additional cases which all found that internal controls not required by the SEC could still be a basis for protective activity. It's the Collins case from the Northern District of Georgia, the Siqueira case from the Northern District of Texas, the Thomas case from the Southern District of Florida, as well as the Third Circus decision in the Wiest v. Lynch case. In addition to providing false information to the SEC, we have also noted that the internal controls rule was violated. The internal control rules is what the Earhart court called it, the decision from the Southern District that both Judge Etkin relied on and the parties decided to. Judge Etkin decided the case to argue that our case would be dismissed. We believe that a close reading of the Earhart case actually shows that this case should not have been dismissed. The internal control rules is found in Sections 13b-2b and 13b-5 of the Securities Exchange Act of 1934, as well as 17 CFR Section 240.13a-15a. The Collins case, the Siqueira case, and the Thomas case also are all cases which found that reporting violations of the internal controls rules could be protected activity. The internal control rules requires companies, and this is where we get to the, while not specifically required NBL, it has to have some controls in place. The internal controls rules requires companies to maintain a system of controls that provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements. Judge Etkin and the defendants have argued, well, the internal controls rules here is not applicable at all because it only applies to financial reporting. In reality, the NBL control is in one of the controls covered by the internal controls rules. In the regulation itself, 17 CFR Section 240.13a, internal controls over financial reporting is explicitly defined to include policies and procedures which provide assurances that receipts and expenditures of the issuer are being made only in accordance with authorization of management and directors of the issuer and regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the issuer's assets. And this is exactly what NBL is. It's a control designed to make sure that the company's assets are being used and disposed of in accordance with authorization of management. And Section 13b.5 of the Exchange Act prohibits anyone from knowingly circumventing any such control, which is exactly what Mr. LaBelle reported Mr. Kravitz admitted when he said that he and everyone else works during their NBL. And then specifically, my time, I'm already past it, but I'll just point out in the Earhart case on this exact topic, in that case, the plaintiff alleged that the policies alleged that disclosures concerning improper loans to risky customers against management's directives had allegedly violated the anti-money laundering rules and were not protected. That's correct, but the court also found that these same allegations were protected because they could violate the internal controls rules, which it explicitly found includes policies and procedures regarding certain items, including providing reasonable assurance that expenditures are made only in accordance with management authorization. All right. So I've covered one of my whistleblowers, but I guess I'm out of time. Well, you have two minutes for a rebuttal. Okay. All right. Unless you want to use it now. You know what? I might as well just, while I'm up here, I think I might as well just bang out all my whistleblowers. We'll give you two minutes. The next whistleblower concerns Mr. LaBelle's disclosure concerning Barclays' failure to preserve electronic communications pursuant to Section 17A of the Exchange Act and SEC Rule 17A4-B4. On this particular whistleblower, Barclays has actually been fined $200 million for this conduct. The only real, Judge Ekin doesn't even really address this point in our opinion. And the defendants have argued, and Judge Ekin kind of bought this argument, that Mr. LaBelle never actually really believed he was reporting this because it wasn't in his original complaint. It's just not true. The decision not to put it in there was my decision, and it was based on the documentary written evidence I had at the time. The genesis of this theory comes from the reply brief that we wrote in support of the motion to amend, and particularly a paragraph ban on JA-66. In the reply, I admit it's a horrible, terrible, no-good paragraph that I wrote. I still don't exactly know what the paragraph means, but I know what it doesn't mean. They jumped on the fourth sentence in this paragraph, which says, As plaintiff has learned during discovery, this policy is driven, at least in part, by the SEC's and FINRA's record retention rules to require Barclays to retain and preserve certain communications. The defendants have argued that somehow this is admission that Mr. LaBelle did not understand that he was reporting violations of the electronic communications recording rules. It's absolutely not. If you look at the previous sentence, it says, This reason is that, as Barclays' counsel has advised plaintiff during the discovery process, it is Barclays' policy that employees only conduct work on firm-issued or approved devices. So in the next sentence, which is referring to this policy is driven, it's referring to Barclays' policy. There is no reasonable, rational interpretation of this sentence to mean that Mr. LaBelle was somehow admitting that he didn't understand that he was reporting the electronic communication rules. And again, that decision not to include that in the complaint was absolutely my decision. I can't say what Mr. LaBelle and I talked about when I was drafting the complaint, but I can say that it was completely my decision and that he, as he put in his affidavit, totally understood the rules as he was reporting them. They also argue that it's not clear from the whistleblower that he was reporting this, but again, if we have the actual transcript of his call with Mr. Martin, and while he's clearly being diplomatic at that point, because I don't think he's trying to lose his job, he's clearly explaining to her that he doesn't have a Barclays-issued device. He's doing work at home on this. He's doing securities work at home. The securities work needs to be reported. He's clearly reporting this issue. And again, this is an exact issue that Barclays was fined $200 million for by the CFTC and the SEC. Really fast, and I'll be done on Client 1 and Client 2. On the Client 2 transaction, again, we believe there was numerous factual determinations made, improper factual determinations made on this one. Mr. LaBelle is reporting that Mr. Kravitz is having, sidestepping him. He's having junior people massage the data to greatly understate risk to the credit committee. Judge Eskin found that in the written whistleblow on this, which is found at J.A. 1961, that he's not actually reporting fraud. He's just maybe raising a general concern. Of course, again, I don't think that's remotely a fair reading of that particular whistleblow, especially on summary judgment. Notably, less than 10 days later, this virtually same exact disclosure is made in his first whistleblow to the SEC, which is found at J.A. 2071. And I'll point out that the defendant clearly understood that plaintiff was reporting potential fraud, because just eight days after the whistleblow, there's notes of a meeting between Mr. Kravitz and Ms. Cohen in H.R. They're talking about what to do with Mr. LaBelle. Defendant claims this is the meeting where the genesis of the decision to terminate Mr. LaBelle happened. In this meeting, the notes of the meeting for Ms. Cohen, Mr. Kravitz admits that one of the reasons that he wants to terminate is because Eric and Larry, Larry is Mr. Kravitz, Eric is Eric Wu, Mr. Kravitz is a right-hand man, feel that they are being watched and written about constantly and can't operate like this. And that's at J.A. 1959. It's clearly a reference to the June 4th whistleblow and an admission of retaliation. Finally, on the Client 1 transaction, two quick points. Again, we believe Judge Etkin made factual determinations that were improper on summary judgment. We believe that he won improperly. I think we're way over now, but I think this is all in your brief. Okay. It is. It is. Thank you, Your Honor. All right. Thank you. We'll now hear from Ms. McManus. Good morning, Your Honors. May it please the Court. I'm Beth McManus of Ellard Sparr, along with co-counsel of Epstein Becker-Green, appearing on behalf of the appellee in this matter, Barclays Capitol. Judge Etkin properly dismissed appellant Brian LaBelle's allegations of whistleblower retaliation asserted against Barclays pursuant to Sarbanes-Oxley. Mr. LaBelle cannot prove his claim as a matter of law, and Judge Etkin's well-reasoned ruling should be affirmed because none of Mr. LaBelle's alleged whistleblows constitute protected activity under the enumerated provisions of Section 1514A of SOX. Judge Etkin's ruling is probably grounded in the plain language of the statute, this Court's interpretation of that statute in Nielsen, and, to quote Judge Etkin, the lengthy and detailed documentary record before the Court. That record, of course, includes Mr. LaBelle's concession that mandatory block leave is not a rule or regulation of the SEC or otherwise required by law, and therefore, as Judge Etkin ruled, as a matter of law, it was not objectively reasonable for Mr. LaBelle to believe that violations of MBL fell afoul of one of 1514A's enumerated provisions. But you're not challenging or quibbling with the subjective belief? No, we're not quibbling with the idea that he might have held a subjective belief. However, what the statute requires, ultimately, is that the conduct be tethered to one of these specific enumerated provisions. And while Mr. LaBelle may have had a mistaken belief, and perhaps that belief might have been reasonable, ultimately, mandatory block leave is not tethered to the specific enumerated provisions of Section 1514A, and that is a requirement for protection under the statute. The record also shows that there are no facts. Ms. Barclay, if that's correct, and SOCS is capping to specific kinds of violations and specific statutes, nonetheless, generally, we hope that companies will not be discharging people for calling to account breaches of internal controls policies or particularly publicly held corporations. And I wonder whether there are any remedies that would be available to someone who felt that he was wrongly discharged for trying to set things right according to the company's own internal procedures. Perhaps there might be remedies, but on this record and under the case law applicable to that record, there are no remedies available to Mr. LaBelle. There may be other instances where there might be breach of contract claims, things like that, that may occur. But again, on this record, Your Honor, no, there are no remedies available to Mr. LaBelle. But potentially breach of contract if you were unlawfully discharged for having called to management's attention breaches of internal control policies. It's possible, Your Honor, and certainly in other cases that analyze these types of claims, courts have had to look to state whistleblower statutes. So, for example, in the Earhart and other decisions where you have California state whistleblower laws, that's also another possibility, but of course that's not operable in this. And the point would be that the SOX whistleblower protection is not an open-ended whistleblower protection for anyone who disagrees about a management decision of some kind. Absolutely, Your Honor. What we don't want is SOX to become a general compliance statute. Instead, it's the specific enumerated provisions, those six specific subcategories that matter and tying the conduct to one of those categories. Thank you. With respect to the other aspects of his concerns about mandatory block leave, there still remains no tether to the enumerated provisions of Sarbanes-Oxley. In particular, he sort of generalized fraud concerns aren't sufficient, and certainly there is no tether to the internal controls rule. While we are not going to argue that the SEC internal controls provision is not a rule or regulation of the SEC, it is. There's absolutely nothing in this record showing that there was any concern about financial reporting. And again, as you see in cases like Earhart and you look at the SEC's release on this issue, it has declined, the SEC has specifically declined to expand the protections of that control to encompass more broad internal control provisions. It's got to be very focused on being directly related to financial accounting, and that's just not the case here. Mr. Lovell raised a concern about working during his mandatory block leave. That was it. There also is no evidence in the record that could suffice to sustain a subjective or objectively reasonable belief that there was somehow a concern in 2018 that there were false attestations being given to the SEC. Number one, the SEC's regulatory curiosity and what happens with respect to mandatory block leave, it's not compulsory and voluntary interest of a regulator does not create an SEC rule or regulation. And again, that is required for protection under the statute. And also the notion that Mr. Kravitz said everyone works on their block leave. Well, number one, untrue. Number two, even assuming that that were to be correct, and it's not, that's all Mr. Lovell was complaining about. Again, working during his block leave, there is no contemporaneous evidence in the record that there was a concern about attestations that he ever thought he was going to make a false attestation. In fact, the record shows Mr. Kravitz sends an e-mail to Mr. Lovell the day of this January 4th incident saying, make sure you cancel your mandatory block leave. Do not attest to it. And there's a conversation, a recorded conversation, showing that there's discussion about if you thought you had to work during your MBL, you couldn't attest, there was another way to handle it. This was not the way. I have a question about something else. Let's say that an employee of a financial institution who lies, outright lies, about something that is pertinent to a decision whether or not to enter into a deal, that the person is eager to have the firm make the deal or eager that the firm not make the deal for whatever reason, and lies to colleagues in discussions whether we should do this deal or not. Is that a covered? And then there's a whistleblow about that. Is that covered by any SEC rule? It doesn't relate to any financial transaction that has occurred. It doesn't come out, so far as I'm aware, in any financial statements. Would that be a covered or a tethered rule? Well, based on that hypothetical, Your Honor, I would try to better understand what were the person who raises that concern, what were their subjective, objectively reasonable beliefs, in raising concerns about the transaction that you just raised. So I would need to better understand what those facts are. Well, I'm asking whether there's a rule apart from whether, I mean, you're saying with respect to the MBL that there's no rule that requires it and that's the end of the inquiry. And I'm asking the same question about this. Is there any rule that's one of the ones covered by Sarbanes-Oxley that would make that a covered offense, to lie about factors that are pertinent to whether or not to enter in the future into a deal? Does that get into financial reporting in any way? Does that get it? Are there any financial reports that would be in any way affected by the fact that there had been such a lie? Again, Your Honor, I would need to know more about the particular facts. I mean, it's- It's something that's raised by the Client 2 episode. Okay. About massaging the numbers. Supposing there were no ambiguity. Supposing that instead of talking about massaging, what had been said was lie about this. Lie about a factor that would be pertinent to whether or not we do this deal. How does it become- Is it covered? Would a whistleblower be qualified under Sarbanes-Oxley for such a thing? Does it violate any SEC rule or statute? Your Honor, I'm not aware of any particular SEC rule or regulation because those aren't the facts here. With respect to the Client 2 transaction, I believe that the attempted tether there is whether or not it constitutes fraud against shareholders, which is the sixth category of Section 1514A. And there, number one, massaging the data is very different than the example that Your Honor just gave. And two, that alleged whistleblower doesn't otherwise approximate any of the other elements of shareholder fraud that would be required to somehow demonstrate a colorable claim under Section 1514A. I see I'm almost out of time. I don't have an opportunity to probably get through the rest of it. But if Your Honors won't indulge me for another minute, I can briefly address the personal devices concern. Personal devices I think might be worth hearing. Okay. I'll very briefly discuss that. So there is simply nothing in the record showing that in 2018, when Mr. LaBelle allegedly raised these Sarbanes-Oxley whistleblows, that he harbored any sort of concern with respect to the preservation of electronic communications or otherwise. And he cannot get past his own lack of a subjective belief. Again, he admits that he only learned of Barclays' policy that employees conduct work on firm devices as part of this litigation. He admits on paragraph, excuse me, on page 45 of his brief, that this claim was, quote, not apparent from the face, end quote, of his 2018 disclosures. He argues on page 48 that the evidence he had access to at the time of his 2018 complaint did not explicitly link the use of personal devices to SEC record retention rules. Well, of course, Mr. LaBelle had access to the subjective beliefs in his mind. And we see nothing about the personal devices concern in either his October 2018 complaint to OSHA or to the district court in 2019. And his lack of any concern regarding record retention is consistent with his statements and behavior in real time. First of all, Mr. LaBelle, in response to Mr. Martin's recorded conversation with her on January 4th, made very clear that he had not engaged in hedging or securities work during his MBL. He made that very clear. He admits to Mr. Kravitz during a recorded January 16th call that nothing nefarious happened during his MBL. His behavior from his testimony shows he actually says he sought out and purchased a temporary phone in the Bahamas to do work on his MBL and didn't retain the records of that. He also says he didn't produce any texts in this case because those texts were deleted pursuant to the auto delete feature on his phone. Someone looking and worried about records preservation doesn't look for a phone in the Bahamas or let things auto delete if they're really concerned about records retention. And, of course, in the alternative, there is no connection between any personal devices concerns and the decision, the well-founded decision to terminate Mr. LaBelle's employment. Thank you for letting us- All right. Thank you both very much. We've observed this- Sir, can we just have one minute? I know I went over. It's a big case. I really need to correct the brief. Well, I mean, look, I think we've got the briefs here. I think we've read them extensively, and we do have another case on the calendar. So respectfully, no. But we've got the briefs for sure. Thank you very much.